UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

THE VILLAGE AT KNAPP'S CROSSING, L.L.C.,
        Debtor.
_____/

Case No. HG 13-06094
Hon. Scott W. Dales
Chapter 11

## MEMORANDUM OF DECISION AND ORDER

PRESENT:   HONORABLE SCOTT W. DALES
                  United States Bankruptcy Judge

### I. INTRODUCTION

This matter is before the court on the motion of International Bank of Chicago (the "Bank") to dismiss or convert the case of The Village At Knapp's Crossing, L.L.C. (the "Debtor") under 11 U.S.C. § 1112(b) (the "Motion," DN 204). As cause for this relief, the Bank contends that the Debtor cannot propose a confirmable plan of reorganization within a reasonable amount of time and that the Debtor filed and prosecuted its case in bad faith. Creditors First Community Bank and the City of Grand Rapids concur in the Bank's Motion (DNs 219 and 220, respectively). The Debtor opposes the Motion and filed a response (DN 221, the "Response").

The court held an evidentiary hearing on June 3, 2014 in Grand Rapids, Michigan, at which the Bank had the burden of establishing, by a preponderance of the evidence, that cause exists to dismiss or convert the case. The court heard testimony from one witness, Steven D. Benner, the Debtor's principal ("Mr. Benner"), and admitted Debtor's Exhibits A through LL and OO through SS, and Bank's Exhibits 1 through 12, mostly on stipulation. The court also

took judicial notice of the Debtor's filed plans (DNs 252, 191, 150), disclosure statements (DNs 251, 190, 151), and the various objections to the same.[1] Fed. R. Evid. 201.

The court has carefully considered the evidence and finds as follows pursuant to Fed. R. Civ. P. 52 made applicable to this proceeding by Fed. R. Bankr. P. 7052.

## II. JURISDICTION AND RELATED MATTERS

The court has jurisdiction over the Debtor's chapter 11 case pursuant to 28 U.S.C. § 1334(a). That case has been referred to this court by the United States District Court pursuant to 28 U.S.C. § 157(a) and LCivR 83.2(a) (W.D. Mich.). The Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) (matters concerning the administration of the estate). The court also finds that it has constitutional authority to enter a final judgment in this contested matter because the issue raised is not a "*Stern* claim," that being, a proceeding that is "defined as 'core' under § 157(b) but may not, as a constitutional matter, be adjudicated as such . . . ." *Executive Benefits Ins. Agency v. Arkinson*, No. 12-1200, slip. op. at 8-9, 573 U.S. ___ (June 9, 2014).

## III. FINDINGS OF FACT

At the outset of the hearing, the Bank offered and the court admitted exhibits conclusively demonstrating that the Debtor's current net income will result in a $324,172 annual shortfall under the Debtor's proposed plan as twice amended. *See* Bank Exhs. 1-7, 11. Although the court recognizes that the June 3, 2014 hearing was not a hearing on confirmation of the plan, it is nevertheless significant that the Debtor's plan -- although amended twice since the Debtor filed it on November 27, 2013 -- remains patently infeasible. Evidently recognizing the inevitable shortfall, and the fact that the Debtor's crown-jewel asset consists of mostly undeveloped land in northeast Grand Rapids, Debtor's counsel candidly conceded that any plan

---

[1] DNs 213, 197, 194, 192, 178, 177, 176, 174, 172, 168, 165.

of reorganization in this case depends entirely on the Debtor's ability to secure financing for development.

More specifically, the prospect of payment under any plan of reorganization depends upon sufficient financing to fund "Phase 1" of the commercial property known as Knapp's Corner Shopping Center so that the property, together with an affiliate's property at 1410 28th Street, will generate rental income sufficient to repay creditors in accordance with the Bankruptcy Code and other applicable law.

As a consequence of this obvious reality, the parties focused their evidentiary presentations on the Debtor's prospects for obtaining financing for development. Debtor Exhibits QQ, RR, and SS (collectively, the "Financing Exhibits"), along with Mr. Benner's testimony, represent the Debtor's best evidence of its ability to obtain financing to develop the Knapp's Corner Shopping Center.

The Debtor offered Exhibit RR, entitled "First Amended Joint Venture Development Agreement" (the "Joint Venture Agreement"), and Exhibit QQ, a Term Sheet for financing from Silver Arch Capital Partners (the "Silver Arch Term Sheet"), as related documents evidencing its ability to obtain a two year, $19,250,000 loan. Mr. Benner testified that the Debtor would use this loan to pay Comerica Bank, the primary lender of the Debtor's related entity, S.D. Benner, L.L.C., $18,750,000 due on August 8, 2014. *See* Exh. Z (April 27, 2014 Settlement Agreement with Comerica Bank). Debtor also offered Exhibit SS, a cover letter and Term Sheet for financing from ARI Capital, Inc. (the "ARI Term Sheet"), as evidence of its ability to obtain an additional two year, $10,000,000 loan. Mr. Benner testified that the Debtor would use this loan to pay off the Bank ($5,019,236), to build the next group of tenants -- presumably meaning to develop the Phase 1 Knapp's Corner Shopping Center -- and to pay off other loans secured by

vacant real property adjoining the development. Mr. Benner testified that he received these documents from the prospective lenders or investors after 10:00 p.m. the night before the hearing.

The Joint Venture Agreement (Exhibit RR) is unsigned, and the Debtor did not verify or otherwise support its validity by testimony from anyone other than Mr. Benner. Exh. RR at 11. He explained that the proposed joint venturer, Walker-Lyautey Enterprises, LLC ("WLE"), insisted that the Debtor execute the agreement first, and that Mr. Benner did not do so because he has not yet obtained the necessary bankruptcy court approval. In response to the court's question, he testified that, although the Joint Venture Agreement includes no reference to the Debtor's role as debtor-in-possession or even to the chapter 11 proceedings, WLE knows that the Debtor is currently in a chapter 11 bankruptcy proceeding. Mr. Benner, whose testimony demonstrated that he was unfamiliar with many of the terms of the Joint Venture Agreement, admitted that it was drafted by the entities' attorneys -- specifically stating that Attorney McInerney represented the Debtor in that process.[2] By its own terms, either proposed joint venturer may terminate it, "without cause," if the parties fail to execute "a definitive Owner entity agreement" by June 30, 2014 (less than thirty days from the date of the hearing). Exh. RR, § 9.2.

In contrast to the Joint Venture Agreement, the Silver Arch Term Sheet (Exhibit QQ) is signed by the counter-party's agent, Jeffrey Wolfer. Mr. Wolfer is evidently the President and CEO of Silver Arch Capital Partners, LLC ("Silver Arch"). Exh. QQ at 4. The borrower is identified as "S.D. Benner IV, LLC, a special purpose bankruptcy remote entity" ("Benner IV").

---

[2] Mr. Banas -- from the law firm appointed as Debtor's general counsel in this case -- admitted that he had not had a meaningful chance to review the documents before the hearing because he received them for the first time the night before. The court is uncertain whether Mr. McInerney, who reportedly negotiated the Joint Venture Agreement, represents the Debtor, Mr. Benner, an affiliate, or some combination.

*Id.* at 2. The "Requested Total Loan Amount," $19,250,000, is subject to a three percent origination fee ($577,500). *Id.* at 1, 2. The court calculates that the net proceeds of this loan, after deducting the origination fee and the Comerica Bank settlement pay off, would equal $77,500 available to Benner IV under that loan.

The Silver Arch Term Sheet also requires the Debtor to pay, up front, a non-refundable $100,000 "Due Diligence Deposit." Exh. QQ at 2. Although it discusses possible financing, the Silver Arch Term Sheet includes the caveat that it is "subject to, among other things, the approval of its loan/credit committee," and that the "Lender has relied on all information provided by Borrower as being true and correct in all respects." *Id.* at 3. An attachment to the term sheet reveals that Silver Arch expects that the 1410 28th Street, SE property has a NOI (net operating income) of $185,940.52. Exh. QQ, Schedule "A." Mr. Benner confirmed in his testimony, however, that in the first nine months of this case, the 1410 28th Street property generated gross rental income of only $63,569. *See also* Exhibit 1. Given the reasonable commercial expectation that rents from a particular property will be used to fund expenses associated with the property, Mr. Benner's suggestion that his other entities, specifically "Benner I" and "Benner III," would pay the expenses of the 1410 28th Street property from sources other than the rents of that property, is not credible.

Although Mr. Benner specifically testified that Silver Arch is aware that the Debtor is in a chapter 11 bankruptcy proceeding, as with the Joint Venture Agreement, the Silver Arch Term Sheet omits any reference to the bankruptcy case or court approval. The Silver Arch Term Sheet also projects an August 22, 2014 closing date (fourteen days after the Comerica Bank payment due date), but expires on June 6, 2014 if not executed by the parties. Exh. QQ at 1, 2. In other words, by its own terms, as of the date of the hearing, the Silver Arch Term Sheet was set to

expire three days after the hearing, well before the August 8, 2014 drop-dead date on the Comerica settlement, and well-before the anticipated August 22, 2014 closing date.

Finally, the ARI Term Sheet (Exhibit SS) is signed by Nicolette Cain, President of Commercial Finance (rather than ARI Capital Inc.). Again, the Debtor did not verify or otherwise support its validity by witness testimony or affidavit. The "estimated" $10,000,000 "Refinancing 'Bridge Loan'" to the Debtor requires a 2% "Company Points" charge ($200,000) and, because of a typo in the term sheet, it is not clear whether the Debtor will be charged eighteen or *thirty-three* percent interest on the loan. Exh. SS, Term Sheet at 1, 2. The court calculates the net proceeds of this loan, after deducting the Company Points charge and the Bank's $5,315,442 pay off, would equal $4,484,558 available to the Debtor. *See* Exhibit 3. According to the ARI Term Sheet, however, the Debtor's failure to accept the terms and conditions of the June 2, 2014 "Application" and submit the same to the lender, together with a $15,000 "Good Faith Deposit," "**within one business (1) day**" rendered it "null and void." Exh. SS at 1, 2. Finally, like the other two Financing Exhibits, the ARI Term Sheet omits any reference to the Debtor's bankruptcy case or any requirement of court approval.

## IV. ANALYSIS

The court has grave concerns about the Debtor's Financing Exhibits, all of which the court regards as too little, too late.

The Debtor is a real estate development company organized principally to develop the Knapp's Corner Shopping Center. From the projections attached to the disclosure statements filed in support of the three versions of its reorganization plan, the Debtor's reorganization depends largely upon the construction and leasing of a major shopping center which, the Debtor hopes, will generate rental income to retire its secured debt in 20 years at 4.75% interest.

Unfortunately, the shopping center is in its infancy, with only a single building and a single tenant (a Chinese restaurant) on the premises so far. The rest of the shopping center remains on the drawing board.

Under these unfortunate circumstances, the Debtor's reorganization depends on transforming presently raw or undeveloped land, improving the site, erecting buildings, leasing, and managing the property in order to generate substantial rent revenues -- a highly speculative undertaking requiring, the court assumes, substantial funding. The most recent disclosure statement describes the situation as follows:

> Debtor continues working to secure financing and/or a joint venture partner to provide capital necessary for further development of the VKC Development Site ("Phase 1") and supplementation of Debtor's rent revenue for payments under Debtor's Chapter 11 Plan. Phase 1 encompasses Debtor's plan to continue construction on the VKC Development Site, the completion of which will create a substantial increase in Debtor's revenue stream and provide more than sufficient income to service Debtor's Creditor's [sic] under Debtor's Chapter 11 Plan.

*See* Second Amended Disclosure Statement (DN 251) at 7. In light of this situation, the Bank focused its presentation on the role that rental income will play in any reorganization of the Debtor, and on the disparity between the Debtor's projections and its existing rents flowing mainly from the shopping center's only tenant, a few tenants in what the court presumes are residential structures along the periphery of the shopping center, and approximately $6,000 in monthly gross rent from an affiliate's tenants at 1410 28th Street. The Bank's summary of rents and proposed plan payments, which shows an annual deficiency of $324,172 based on historical figures, amply establishes that developing the shopping center and generating rents is the key to any reorganization.

Recognizing that the development of the shopping center is central to any reorganization, and that development takes cash, the court encouraged the Debtor to establish at the hearing "a firm commitment, or reasonable likelihood of such commitment, from a financier ready, willing and able to save the project." *See* Second Scheduling Order (DN 242) at 2.

With the exception of Mr. Benner's testimony as to his understanding of the Financing Exhibits, the Debtor failed to present any evidence to establish their validity or efficacy. Indeed, the Debtor offered no testimony from anyone representing the supposed lenders or investor, a damning omission given the importance of funding and given the skepticism about funding that the Bank and the court earlier expressed. The court perceived Mr. Benner's testimony regarding the Financing Exhibits as optimistic but evasive and frequently non-responsive concerning the specific information critical to its decision in this matter.

Moreover, none of the Financing Exhibits are signed by all parties, suggesting the absence of agreement in each instance. Nor, for that matter, does any of the documents mention the Debtor's bankruptcy case or include a condition for court approval, as would naturally appear in any proposed post-petition financing that is as close to fruition as Mr. Benner would have the court believe. The omission strikes the court as significant. Mr. Benner's explanation that he could not sign the agreement without court approval rings hollow: a sophisticated developer with over thirty-years of experience in the field, and with the assistance of counsel, could easily sign a contract in advance of court approval by inserting a term conditioning the estate's obligations on such approval. It happens all the time, as Mr. Benner well knows, if only from his experience with the Comerica Bank settlement (which included a term involving bankruptcy court approval of the Debtor's role). Notwithstanding Mr. Benner's testimony to the contrary,

the court doubts that the non-debtor counterparties to the Financing Exhibits were fully informed of the Debtor's bankruptcy filing.

Even assuming the proposed lenders were aware of the Debtor's bankruptcy, none of the documents includes any deadline that the Debtor could possibly meet while also obtaining bankruptcy court approval.[3] And, the Debtor has taken no steps to secure approval within the very limited windows each document prescribes, for example by seeking to shorten notice or even filing a motion for approval. This latter shortcoming is not surprising because the documents arrived at counsel's doorstep literally at the eleventh hour on the night before the hearing, suggesting that Mr. Benner slapped them together to meet the litigation-related need to respond at the hearing, not necessarily the long term needs of the development and the reorganization in general.

Indeed, the Silver Arch Term Sheet does not even propose to lend money to the Debtor or for the Debtor's benefit, and instead contemplates a loan to a "bankruptcy remote" entity other than the Debtor, with no provision for getting the funds to the Debtor (or even S.D. Benner, LLC and S.D. Benner III, LLC, to fund the Comerica settlement payment).

More generally, the two term sheets, though signed by a non-debtor party, amount to nothing more than introductory, non-binding expressions of interest, with impossible deadlines and steep costs for an already cash-strapped[4] debtor-in-possession. Considering how central financing concededly is to the success of any reorganization for this Debtor, the illusory and

---

[3] Although Mr. Benner testified that the parties to these agreements were aware that the Debtor was in a chapter 11 bankruptcy proceeding, the court finds it implausible that any lender, or attorney for that matter, would prepare an agreement or term sheet that could be binding on a lender without prior bankruptcy court approval. The court is also genuinely concerned about the Debtor's use of Attorney McInerney to negotiate the terms of the Joint Venture Agreement, to the extent this attorney has not been vetted under the court's procedures governing retention of counsel. 11 U.S.C. § 327; Fed. R. Bankr. P. 2014; LBR 2014. The court is not aware of any order authorizing Mr. McInerney to perform work on behalf of this debtor-in-possession.

[4] Mr. Benner testified that the Debtor currently has only $160,000 cash on hand.

preliminary nature of the Financing Exhibits signals to the court that timely and sufficient financing is, for whatever reason, a pipe dream at this point in time -- over ten months into the case. Furthermore, because of the inaccurate information the court finds in the Silver Arch Term Sheet, and the omission of any reference to the bankruptcies of the Debtor and its affiliates, the court finds it unlikely that, after performing due diligence, either lender would be willing to actually execute a loan agreement with this Debtor.

The financing arrangements that are so crucial to any reorganization in this case are in their infancy, this late in the case. Even if the Debtor were to somehow finalize these loans in a time frame in which the Comerica Bank debt could be paid in full (thereby preventing Comerica Bank from taking control of the membership interests in the Debtor and jeopardizing the rents derived from 1410 28th Street), the record lacks any evidence that the net proceeds of the loans would be sufficient to enable the Debtor to successfully develop the Knapp's Corner Shopping Center - Phase 1 project and also fund its plan of reorganization. Although the Debtor offered the preliminary term sheets and unsigned Joint Venture Agreement, it failed to present any testimony regarding the Debtor's specific financing needs to fund the bulk of the shopping center's development, leaving the court to speculate whether whatever remains after paying origination fees, transaction costs, and Comerica, is sufficient to fund administrative expenses and complete a project that historically has encountered resistance and other hurdles to which the disclosure statements have alluded.

As set forth in the court's Second Pretrial Order (DN 242) in this contested matter, the principal factual basis for the Bank's futility and bad faith arguments is the same, namely that a successful reorganization is contingent upon the development of the Knapp's Corner Shopping Center where presently the Debtor has a single tenant, P.F. Chang's Restaurant. Without this

development, the Debtor's financial projections set forth on Bank Exhibit 7 (showing projected rents in the amount of $1,155,692.68 for the twelve months ending January 31, 2016) are fanciful puffery. Indeed, if the Debtor's plan as recently amended were confirmed, the debt service for unsecured creditors would require annual net revenues of at least $412,196. Bank Exh. 1; Debtor Exh. KK. Because the development of the shopping center has been stalled since approximately 2011, and because there is no realistic and timely prospect for an investor or lender to supply the funds (in some as yet unspecified amount) necessary to develop the parcels, the Bank contends with good reason, that the reorganization is doomed.

Moreover, and for similar reasons, Mr. Benner and his counsel, ought to have known when they filed this case on the eve of the Bank's foreclosure, and again when they filed an unconfirmable plan on the eve of the expiration of the Debtor's exclusivity period, that the prospects for reorganizing several undeveloped parcels of real estate without substantial financing and without a realistic blueprint for exiting chapter 11 would be justly challenged as lacking good faith.

Indeed, from the record, including the relationship of this case to the other Benner cases[5] as well as the several iterations of the Debtor's plan which contemplates a third party injunction in favor of Mr. Benner, the court infers that the ultimate motivation for the filing was to protect Mr. Benner, as guarantor, rather than to pursue any meaningful reorganization. This, in the court's view, is not a proper use for Title 11. Certainly, the lack of progress in this case evidenced by a plan that, though amended twice, remains merely a placeholder for exclusivity under § 1121(b), and unsigned financing documents, contradict Debtor's contention that Mr. Benner is central to the reorganization. The court credits his testimony that the companion cases

---

[5] *In re S.D. Benner, III, L.L.C.*, Case No. 11-08112 (Bankr. W.D. Mich.); *In re S.D. Benner, L.L.C.*, Case No. 11-08113 (Bankr. W.D. Mich.).

referred as "Benner I" and "Benner III" have diverted his attention, and that he has not sat idly during the case.  Nevertheless, the court concludes on this record that he has been ineffective on the key issue in this case (arranging financing for the development), making it implausible that the court would ever find the "unusual circumstances" warranting a third-party injunction, or that such an injunction is "essential to reorganization" or that the reorganization "hinges" on immunizing Mr. Benner from suit on his guaranty.  *Class Five Nev. Claimants (00-2516) v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 658-59 (6th Cir. 2002).  The court does not doubt Mr. Benner's experience, only his effectiveness given the substantial hurdles he and his various enterprises have faced in connection with the project over the last several years.

The evidence preponderates in favor of finding "cause" under § 1112.  The Debtor's inability to arrange meaningful financing after ten months into the case is of paramount significance because it signals an inability to complete the real estate development upon which the Debtor has admitted any reorganization depends.  Without financing, the reorganization proceeding is an exercise in futility, and the delay in liberating value from the estate's assets prejudices the rights of the creditors, including the Bank and presumably the others who have concurred in the Motion.

In deciding whether to convert or dismiss a chapter 11 case, the statute directs the court to consider "the best interests of the creditors and the estate." 11 U.S.C. § 1112(b)(2).  Here, the active creditors in this case have expressed a preference for conversion rather than dismissal, and based on the schedules, the court finds that the estate includes substantial assets for an independent trustee to investigate and perhaps administer.  Under the circumstances, the court will convert rather than dismiss the case.

V. <u>CONCLUSION</u>

Title 11 does not provide an appropriate or useful framework for real estate speculation. It is not fair to expect creditors to bear the risks of dicey ventures while their hands are tied by the automatic stay and other remedial provisions of the Code. Chapter 11, in particular, is designed for rehabilitation not incubation, and real estate development activities involving incipient projects, without a firm and timely prospect for financing, should generally not take place under the aegis of the Bankruptcy Code.

For the reasons set forth above, the court will grant the Motion and enter a separate order converting the case to a liquidation proceeding under chapter 7.

NOW, THEREFORE, IT IS HEREBY ORDERED that that the Clerk shall enter a separate order converting the case, using the court's usual form, which upon entry shall constitute the order for relief under chapter 7 as contemplated in § 348(a).

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Memorandum of Decision and Order pursuant to Fed. R. Bankr. P. 9022 and LBR 5005-4 upon William G. Tishkoff, Esq., Michael R. Wolin, Esq., Robert D. Nachman, Esq., Melissa Brown, Esq., Steven Roach, Esq., Sara E.D. Fazio, Esq., Gordon Toering, Esq., Sandra Hamilton, Esq., Dean E. Rietberg, Esq., the twenty largest creditors, and other persons requesting notice of these proceedings.

END OF ORDER

**IT IS SO ORDERED.**

**Dated June 9, 2014**



_____
Scott W. Dales
United States Bankruptcy Judge